Thank you, Your Honor. May it please the Court, thank you for accommodating me this morning. This case involves an interrogation conducted by Inspector Hendricks. The interrogation turned on a coercive and fraudulent choice that the detective made to Mr. Jimmerson. It was based on a threat that had the counterside of an implied promise of leniency. Counsel, tell me if I've got this right. The threat, as I recall, was not a threat to beat him up or something like that. It was basically a threat that his grandmother might be arrested. No. That's not the threat that I would lead with, Your Honor. Okay. Maybe you could give me the words and the reference, just what the threats are. The threat is that if you continue to assert your innocence, I and the district attorney will start at the high end. The high end meaning capital prosecution. That is a threat. It's actually a threat of violence, I think, on the order of Arizona v. Fulminante. And just like in Arizona v. Fulminante, the coercion is that I will offer you an out from that threat. If you assert your innocence, we are going to, or you jeopardize your life, or at least the possibility of spending the rest of your life in prison. However, and this happens when you murder people. Excuse me? That happens when you murder people. You murder people, you can spend the rest of your life in prison.  What's the matter with that? Well, the threat is that if you assert your innocence, this will be the legal consequence. That is a falsehood, Your Honor. If you assert your innocence, it may be that if the evidence is overwhelming, that you will be prosecuted for capital murder. But it is not a legal consequence of asserting your rights and standing on your privilege not to be incriminated, not to incriminate yourself. That was a false representation. But it's the flip side in this case. Two things were really well established. One was that deals could be made. Plea bargains are now no longer in the shadows the way they were in the 60s and 70s. They're now explicit and on the record where people get lenience in exchange for plea. And I thought the other thing that was well established by the case law was that it's constitutionally permissible for police to lie to suspects that they're interrogating. Well, it is not. What am I missing here? I know you've cited Schneckloth and one or two other cases from around 1970. And I thought the refinements subsequent to that had clearly established these two principles. Am I mistaken? Well, I think you are, Your Honor. I don't think there is a case out there that stands for the proposition that a misrepresentation by a police officer as to the legal consequences of either asserting your innocence or of confessing to the scenario that the detective offers the suspect is permissible. And that is stated in Miranda and continues to this day. But there are very few cases that deal with legal misrepresentations. I think the best statement that I have found is in a district court opinion in this district, Garvin v. Farman, where Judge Alsop says that if you can misstate the legal consequences, then where otherwise the police could trick many unrepresented suspects into making admissions in order to avoid the threat of a first-degree murder prosecution. And that is exactly what happened here. And the threat is important, Your Honor, but it's really the implied promise of leniency that made the threat effective. Because what Hendricks said to Ramon was, okay, if you assert your innocence, these terrible things could happen. You may never see your daughter. You could get the death penalty. You could be in prison for the rest of your life. But if you don't assert your innocence, if you admit to the shooting, but you say that, well, when I woke up that morning, I didn't plan it, it wasn't premeditated in that sense, then Hendricks says that will make a difference when you get to court. And it's not just some amorphous statement on Hendricks's part. He says, I guarantee it. Where does he say this? He says that it's the prosecution's transcript, pages 71 and 72. That's Exhibit C as part of CR 11, I think. Well, we've got the defense transcript. The defense transcript is page 80. And we've got the tape. Okay. The defense transcript is page 85. Okay. It starts actually on 84. Okay. So you can let me go home tonight. I can let you go home tonight. No, I can't let you go home tonight. You have to tell the truth. That's all I'm telling you. I'm telling you the truth. If you tell the truth about what you did, yeah, I get to go home, et cetera, et cetera. That part, huh? I can't tell you I'm going to let you go home because I would be lying. Is this the part that you're talking about? And are you getting to it will make a difference in your case? It would make a difference on your case. That's what I'm saying, dude. It will make a difference in your case down the road. I guarantee you that. So all he's guaranteeing is that telling the truth will make a difference. Well, I think if — I think that takes it a little bit out of context, Your Honor, because — I just read the context. Well, but the context is telling the truth, and he says, that's what I'm saying, dude. Inspector, it will make a difference in your case down the road. I guarantee you that. I'd be true to you on that. I promise you that, that I can talk about. I can't get you to go home. Well, Inspector Hendricks made clear at another point in the transcript that when he speaks of the truth, he only means one thing, and that is a confession to having shot Mr. Hoskins. Is this the only place, though, where the word guarantee is used? I think it may be the only place where the word guarantee is used, yes. But that's — he says it, and he says it pretty emphatically at that point. Well, you know, I don't want to quibble on this, but I read that as saying telling the truth is going to make a difference. Well, if you step back, Your Honor, the entire interrogation is premised on there being two possibilities. Hendricks says either you had a plan, you brought the gun with you to this scene with a premeditated plan to kill this guy, or you just happened upon him, you happened to have a gun, something happened, and you shot him. And Hendricks specifically says those are the only two possibilities we are going to talk about. That is — those correspond to what my witnesses say, and that is it. Everything else he considered a lie, and he said this over and over again. The problem is it was a lie, and he had witnesses that pretty much established that. He played a witness for your client. He played the tape with a witness who says, yeah, I know who did it. I've known this kid forever. I don't think it undermines the coercion if three-quarters of the interrogation consists of statements that are truthful or not coercive. What is coercive here, though, is for the inspector to set it up, and when he sees that the interrogation is not ending in a confession, he turns the screw, and he makes a false representation that all I'm asking you to do is tell the truth, because there is first-degree murder second, and right on down the line, and somewhere between manslaughter and first-degree murder, this case fits. And until I hear your side of it, I don't know where it fits, so I have to start out at the high end. Yeah. Because that's where the DA is going to start. He says there's lots of possibilities, including the gas chamber. There's life without the possibility of parole. Kagan. Counsel. I'm just looking here, Your Honor, just for a second for the ---- I just don't see where he ---- the ---- When Hendricks referred to the truth, this meant one thing only, quote, the truth is going to have to coincide with what those witnesses say. And he ---- that's at Exhibit D-78 and Exhibit C-66. And he had just gone through how those witnesses had identified the defendant as the killer. So the statements that you're reading, the guarantee, the promise, comes in the context of saying there are only these two possibilities. I know you shot him. So either we're talking about premeditated murder, which could end up as capital murder, or you can admit to having shot the guy, but that you didn't wake up that morning and plan it. Those are the only two possibilities. So when he says that it will make a difference, I guarantee it, he's talking about admitting to that scenario. Because he says you don't want to go to court and have the judge believe that you premeditated this. I'm sorry, Your Honor. Yes. I've got eight seconds left. If you want to reserve any time or ---- I do. Thanks. We'll give you a minute on the bottle. Thank you. Thank you, Your Honor. May it please the Court, I want to point out, to emphasize the fact that this case arises under the ADPA, as the Court's well aware, and there's a certain amount of deference that is given to the State court's findings. And your name is? I'm sorry. Alan Yano, appearing for the Respondent, Your Honor. Sorry. The appellant has argued in his brief that the Court, in this case, there's no deference due because, based on the reasoning of Taylor v. Maddox. But I would respond to that by pointing out that the Court in this case did discuss both versions of the or acknowledge the existence of both versions of the confessions, both transcripts. The way I saw it, the way I read the record, the Court also listened to, saw the videotape. Is that right? My understanding was that the videotape was not ---- the trial court did, yes. That's what I meant. Well, the trial court did. The trial court did, that's right. And I want to point out that the ---- there's no indication that the appellate court did, but on the other hand, there's a mechanism by which Mr. Jimmerson's State appellate attorney could have requested that the exhibit be sent up to the appellate court. We have it. Pardon me? And we have it. We've seen it. I don't know if the Court has it. So my point would be this. First of all, I ---- Why don't we assume that there was the grandma statement? I didn't watch it myself. I had my law clerk watch it, and she said it was really clear on there that the policeman said grandma and them is in jeopardy. So why don't you argue on that? All right. Well, my point is this. I heard the tape, too. I'm ---- I heard the word grandma, but I thought that what was said afterwards was not clear. And so we're looking about what's an unreasonable determination. I would say that what the court, the State court found is not an unreasonable determination. The other point that I would make is this, that, as we pointed out in our brief, after the grandma statement, Mr. Jimmerson continued to deny any involvement in the crime. He did not admit any involvement until there was the actual ---- oh, let me ---- oh, one more thing before I say that. Let me point out that the inspector said, don't bring grandma into this. Okay. So from this, we ---- the Court could infer that there was no threat to the grandmother. But getting back to my previous point, I would point out that after the ---- Mr. Jimmerson only started admitting involvement after the tape of Mr. Mack was played. And at that point, he starts negotiating. And I think he negotiates about ---- I believe that there were 20 pages of negotiation before he said something that was incriminating. So the State court, I would argue that the State court could reasonably conclude from that that what turned the tide in his case was not any sort of alleged threat to the grandmother, but was the playing of the tape and the identification of Mr. Jimmerson by Mr. Mack, someone who had known him for quite a long time. So that ---- so that would be my response to Your Honor's question. The other point I would like to make, too, is I would like to go address an issue that was glanced upon in the briefs, and that was the substantial injurious ---- whether ---- assuming, arguably, the tape was improperly admitted, did it have a substantial injurious effect on the verdict? And I would point out that, no, it did not, because the jury convicted the defendant of first-degree murder. If we look at Mr. Jimmerson's statement, he says several different things. He said he finally admits shooting. He says that he did it to scare him. Another point, he says that he did it because the victim had threatened him. He said it's him or me, or the victim threatened him. Now, if the jury had credited that statement, that would not be first-degree murder. It could arguably be an argument of genuine but unreasonable belief in the need for self-defense, which would be voluntary manslaughter in California. So the jury could not have reached the verdicts of first-degree murder by crediting this confession. The other point is that the ---- I think the jury must have believed that the ---- must have found the first-degree murder verdict based on the fact that the victim was shot three times and that there were six bullet casings in the area. The point ---- what implicates Mr. Jimmerson in the murder is not merely his confession, but the fact that we had one witness who identified him in a photo lineup and another witness who knew him very well, so I'm running away. But unless the Court has further questions, I would submit it. Thank you. Thank you. I have answered these contentions in the reply brief, and I won't repeat myself. I would just say that the standard is not whether the coercive conduct turns the tide. It's whether or not or that some other non-coercive evidence turned the tide, but rather whether or not the coercion helps to propel the confession, and that's the U.S. Supreme Court standard, and that's cited in the brief. I would also just say to Judge Kleinfeld that the difference between ---- For us, it's whether this is an unreasonable application of laws. I think personally, that is the easy part of this, because the Court ---- the California court of appeal not only didn't watch the videotape and not only credited only the prosecution's counsel. Were they asked to watch the videotape, and is counsel correct that opportunity was available and it was not taken advantage of? Well, they were not asked to, and that was a mistake, but they were conducting de novo review, and I don't see how you conduct de novo review of an interrogation A, without watching the videotape, and B, while only relying on the prosecution's transcript, it's like considering a sufficiency of the evidence argument and only looking to the district attorney's closing argument. And the other thing I was going to say is that ---- That's ketchup. Well, it taints their entire analysis, because they're supposedly making a de novo determination that there was no coercion. They don't watch it. They only look at what I think is the less accurate transcript of what occurred, and they're reaching their conclusions. Does that make their ruling unreasonable? Well, I think it ---- yes, I think it does taint any conclusion they reach. But the most important part is that they don't deal with any of the language that Petitioner submits was both a threat and a promise and a lie. They just lost all that over. To the point of, okay, we can look at this stuff and decide whether the trial court made an unreasonable determination. Well, I don't think the law does permit you to do that. I think there are Ninth Circuit cases that require you to look at the court of appeal opinion, but ---- Which cases are those? You mean the trial court's irrelevant? The trial court was the one who saw the tape, looked at the transcripts, was on the scene. Well, the State court of appeal conducts de novo review on an interrogation issue. So the trial courts, there are no witness ---- I mean, to the extent there may be credibility questions, that's one thing. But, no, the California law is if there's a tape, then the appellate court is just as capable of drawing legal conclusions. Sure, it's capable. What case says, if the trial court has done a thorough job, take Taylor v. Maddox as your opening, that somehow there's something defective because the appellate court didn't do the kind of job that you would have liked to have been done? Well, the trial court didn't do a thorough job. But there are cases, Your Honor, I didn't come prepared. I have seen them. I have seen them. But I will try to find them. You got a site for us? I will try to find them. I cannot at this moment. What do you mean the trial court didn't do a thorough job? The trial court had both transcripts and looked at the tape. But the trial court doesn't do a written opinion and analysis, so there's nothing to analyze there. Okay. Okay. That's fine. Thank you. The case just argued is submitted for decision. We'll hear the next case, United States v. Saddam al-Paraz is submitted on the briefs. The next case for argument is Raspberry v. Garcia.
judges: Schroeder, Trott, Kleinfeld